UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

———————————————————

| | |
|---|---|
| MICHAEL INMAN and KELLY CONSALVO, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| JOSEPH SICILIANO, BARRY BOUCHARD, KYLE MIMNAUGH, JARED PHILLIPS, MATHEW SWAINE, MICHAEL CICCOLINI, and THE CITY OF LEOMINSTER, | ) ) ) ) ) ) |
| Defendants. | ) ) |

Civil Action No.
10-10202-FDS

———————————————————

MEMORANDUM AND ORDER ON
MOTION FOR SUMMARY JUDGMENT

SAYLOR, J.

This is a civil rights action arising under 42 U.S.C. § 1983.  On the night of July 7, 2008, police officers in Leominster, Massachusetts, searched a motel room occupied by plaintiffs Michael A. Inman and Kelly Consalvo.  The officers were seeking Inman's son, Michael A. Inman, II, who was under investigation for drug crimes and was believed to be armed and dangerous.  Inman (the father) and Consalvo were detained—in handcuffs and, in Inman's case, naked—for as long as thirty minutes as the officers questioned them about the whereabouts of Inman's son.  Plaintiffs contend that the officers violated their constitutional rights and that their supervisor and the city are liable for failure to provide proper oversight and training.

Defendants have moved to strike portions of the plaintiffs' filings and for summary

judgment.  For the reasons set forth below, the motion to strike will be denied.  The motion for summary judgment will be granted as to the claims for supervisory and municipal liability; granted as to the excessive-force claim; granted as to the state-law claims for intentional infliction of emotional distress and civil conspiracy; and denied as to all other claims.

## I.    Background

The facts are stated in the light most favorable to plaintiffs unless otherwise noted.

### A.    Investigation of Michael Inman, II

During June and July 2008, officers in the Leominster Police Department ("LPD") were investigating Michael A. Inman, II, the 18-year-old son of plaintiff Michael A. Inman.  (Def. Facts ¶ 2, Ex. 2, 6).  The officers made use of a confidential informant in connection with the investigation.  (*Id.* ¶ 3, Ex. 2).  On the basis of tips from that informant, they suspected Inman II of selling marijuana and cocaine from his residence at 20 Abbey Road in Leominster.  (Def. Ex. 2 at 2-6).  A yellow 2006 Dodge Charger was registered in Massachusetts to Inman II, and the informant also indicated that Inman II used the vehicle in connection with those drug activities. (*Id.*).

Several times during the investigation, defendant Joseph Siciliano, a detective in the LPD, observed a confidential informant make controlled purchases of cocaine and marijuana from Inman II.  (*Id.* at 2-4).  Some of these transactions occurred at the 20 Abbey Street apartment and others occurred at arranged locations to which Inman II arrived in the yellow Charger.  (*Id.* at 2-6).  Based on these observations and the reports of that informant and another that Inman II carried a handgun, Siciliano sought two warrants authorizing searches of the yellow Charger, the 20 Abbey Street apartment, and Inman II himself.  (*Id.* at 6).  The warrants issued on July 6,

2008.  (Def. Facts ¶ 5-6 Ex. 3, 4).

### B.    Plaintiffs' Return to Leominster on July 7, 2008

In 2008, Michael A. Inman and Kelly Consalvo were romantically involved and resided together in Lunenberg, Massachusetts.  (*Id.* ¶ 7, Ex. 1, 5, 18).  On July 7, 2008, they returned to Massachusetts from a vacation they had taken together at Hampton Beach, New Hampshire.  (*Id.* ¶¶ 18-19, Ex. 10).  Inman was sunburned, and because they did not have air conditioning at their home, they decided to spend the night at the Motel 6 in Leominster, several miles from their residence.  (*Id.* ¶ 20, Ex. 1, 14).

Inman is a federal air marshal and was scheduled to leave for the airport early the next morning.  (*Id.* ¶ 21, Ex. 1).  After checking in at the motel office, Inman and Consalvo drove to the house of Inman's ex-wife.  (*Id.* ¶ 24, Ex. 1, 14).  Consalvo picked up a second vehicle there, drove back to the motel, and obtained a key to their room.  (*Id.* ¶ 25, Ex. 10).  Inman remained at the house to speak with his ex-wife before he too returned to the motel.  (*Id.* ¶ 26, Ex. 10).  Once in their room, they showered, ate, and watched television.  (*Id.* ¶ 27, Ex. 1, 10).  Inman placed his holstered firearm and federal law enforcement badge on the bedside table and they both went to sleep early.  (*Id.* ¶ 27, 35, Ex. 1, 10).

### C.    Police Activities on the Night of July 7, 2008

Meanwhile, at about 8:00 p.m., Siciliano and other Leominster police executed the search warrant on the Charger.  (*Id.* ¶ 7, Ex. 5).  The occupant of the car, who was not Inman II, was in possession of a switchblade knife.  (*Id.*).  Soon thereafter, the officers executed the search warrant on the 20 Abbey Road residence.  (*Id.* ¶ 8, Ex. 5).  Inman II was not there at the time, but the

search did uncover drugs and drug paraphernalia, a loaded shotgun, four shotgun shells, an empty

gun case for a handgun, and 9-millimeter ammunition.  (*Id.*).

When Siciliano returned to the police station, he was informed that the department had

received a report that Inman II had fired gunshots at the house of his ex-girlfriend.  (*Id.* ¶ 9, Ex.

5).  A confidential informant later contacted Siciliano by phone and indicated that a car belonging

to "Michael Inman" had been seen parked at the Motel 6 in Leominster.  (Pl. Facts ¶ 11, 94, Ex.

14).[1]  Siciliano went to the motel office and checked the guest register.  (Def. Facts ¶ 12, Ex. 5, 7,

8).  Room 160 was registered to "Michael A. Inman."  (*Id.*).

Detective Siciliano contacted defendant Lieutenant Michael Ciccolini, the officer-in-charge

at the station that night, and requested backup.  (*Id.* ¶ 13, Ex., 7, 9).  Ciccolini dispatched

defendant Sergeant Matthew Swaine, the patrol supervisor, and other patrol officers, including

defendants Barry Bouchard, Kyle Mimnaugh, and Jared Phillips.  (*Id.* ¶ 14, Ex. 9).  The officers

gathered at the motel office, where Siciliano briefed them on the situation.  (*Id.* ¶¶ 15-16, Ex. 7).

### D.    <u>Entry into Plaintiffs' Room</u>

Shortly after 11 p.m., Inman and Consalvo were awakened by a pounding on the door of

their motel room.  (*Id.* ¶ 28, Ex. 1, 10).  Inman, who had been sleeping nude, wrapped himself in

a towel and went to the door.  (*Id.* ¶ 29, Ex. 1, 10).

Inman pulled back the curtain of the window and saw five officers "stacked up" at the

door.  (*Id.* ¶¶ 30-31, Ex. 1, 10).  They had drawn their weapons and were screening themselves so

---

[1] Neither of the vehicles that Inman and Consalvo had parked at the motel were the yellow Charger, and both were registered to Michael Inman, not Michael Inman II.  (Pl. Facts ¶ 97).  However, the police knew from earlier observations during the investigation that Inman II sometimes drove other cars, including his father's.  (*Id.*, Ex. 1 at 11).

as to avoid potential gunfire from inside the room.  (*Id.* ¶ 30-31, Ex. 1, 10).  One officer, whom

Inman noticed had tattoos on his arms, told Inman he was under arrest and to open the door.  (*Id.*

¶ 32, Ex. 1, 10).  Inman opened the door.  (*Id.* ¶ 33, Ex. 1, 10).

The officers rushed into the room with their weapons drawn and one or more of them

conducted a protective sweep.  (*Id.* ¶¶ 36-37, Ex. 1).  Inman's holstered weapon was on the

bedside table in plain sight.  (*Id.* ¶ 36, Ex. 1).  The officer with the tattoos pushed Inman to the

floor and placed him in handcuffs.  (*Id.* ¶ 38, Ex. 1).  Inman asked what was happening, identified

himself as a federal marshal, and indicated his gun and badge on the table.  (*Id.* ¶ 39, Ex. 10).

Defendant Bouchard, who was standing behind Inman, responded, "[S]hut the fuck up.  We'll do

the talking."  (*Id.* ¶ 40, Ex. 10).

Consalvo was in bed when the officers entered the room.  (*Id.* ¶ 66, Ex. 10).  She

attempted to pull the covers over herself, but an officer told her, "don't fucking move."  (*Id.* ¶¶

67, 69, Ex. 10).  Two officers approached her with weapons drawn to place her in handcuffs, and

one told her to get off the bed.  (*Id.* ¶¶ 70, 71, Ex. 10).  She did not move—because the other

officer had told her not to—until the second officer shouted, "get the fuck out of bed."  (*Id.* ¶¶

72, 73, Ex. 10).  She was then placed in handcuffs and forced to sit at the edge of the bed.  (*Id.* ¶

74, Ex. 10).

Inman remained on the floor for approximately five minutes.  (*Id.* ¶ 43, Ex. 1).  During

that time, an officer asked him where his son was, and Inman replied that he did not know.  (*Id.* ¶¶

41, 42, Ex. 1).  At some point the tattooed officer pulled Inman upright.  (*Id.* ¶¶ 45, 46, Ex. 1).

The towel that was covering Inman fell off, and he remained naked as two officers continued to

shout at him and demand the location of his son.  (*Id.* ¶ 47, Ex. 1).  One officer allegedly said,

"Where's your son at?  You're a piece of shit.  You're a liar.  You're going to lose your job over this."  (*Id.* ¶ 47, Ex. 1, 10).

Consalvo recognized detective Siciliano.  (*Id.* ¶ 75, Ex. 10).  In 2003, she had been a victim of domestic violence at the hands of her then-boyfriend, who himself was the target of a drug investigation at that time.  (*Id.* ¶ 90, Ex. 10).  Consalvo was present on one occasion when detective Siciliano and other officers executed a search warrant at the residence of that man.  (*Id.* ¶ 89, Ex. 10).  Now, when she recognized Siciliano, she said to him, "Come on, man, you know me."  The detective denied that he knew her.  (*Id.* ¶¶ 75-76, Ex. 10).

About thirty minutes after the search began, detective Siciliano again asked Inman where his son was.  (*Id.* ¶ 51, Ex. 1).  When Inman replied that he did not know, Siciliano asked him to try calling his son on a cell phone to help locate him.  (*Id.* ¶¶ 49-50, Ex. 1).  When Inman agreed, the officers removed the handcuffs and allowed him to put on a pair of shorts.  (*Id.* ¶ 52, Ex. 1).  They then put the handcuffs back on Inman with his hands in front of him so that he could use a phone.  (*Id.*).  He made several unsuccessful attempts to call his son, both on his own cellular phone and on one provided by detective Siciliano.  (*Id.* ¶ 53, Ex. 1).

At some point, the officers removed the handcuffs from both Inman and Consalvo.  (*Id.* ¶¶ 53, 81, 82, Ex. 1, 10).  Consalvo made several calls in an attempt to locate Inman II, but could not do so.  (*Id.* ¶ 83, Ex. 10).  One of the officers accused Inman and Consalvo of "hiding him out" and searched under the mattress of the bed and in the drawers in the room.  (*Id.* ¶¶ 85-86, Ex. 10).

Finally, an officer threw Inman's weapon and badge on the floor, and all five left the room.  (*Id.* ¶ 53, Ex. 1).  They spoke outside the hotel for several minutes and then returned to the police

station.  (*Id.* ¶ 91, Ex. 7).  According to the LPD's dispatch records, the officers were at the

Motel 6 site for a total of about 34 minutes, from 11:11 p.m. until 11:45 p.m.  (*Id.* ¶ 92, Ex. 11).

     In the following days, Inman cooperated with detective Siciliano in the investigation.  (*Id.*

¶¶ 63-64, Ex. 13).  He eventually located his son and arranged for him to turn himself in to the

authorities.  (*Id.* ¶ 65, Ex. 1).

     Both Inman and Colvano allege that they have suffered emotional trauma and humiliation

as a result of the events of July 7.

     **E.**     **Leominster Police Department Policy**

     LPD policies describe certain of the supervisory duties Ciccolini had as a lieutenant and as

the officer-in-charge on the night of the incident.  The passage that defines his duties as lieutenant

provides in part:

> A. [T]he Lieutenant has direct control over all members and employees of the
> department.  He is responsible for the direction and control of personnel under his
> command to assure the proper performance of duties and adherence to established
> rules, regulations, policies, and procedures . . . .
>
> . . .
>
> B.  General Duties and Responsibilities
>
> . . .
>
> 4.  Organize and assign duties to assure proper performance of departmental
> functions.

(*Id.* ¶ 101, Ex. 16).

Ciccolini's duties as the officer-in-charge included:

> The Officer in Charge . . . is responsible for the immediate supervision and control
> of all officers under his command and is personally responsible for their efficiency
> and effectiveness as a member of the department.

(*Id.* ¶ 102, Ex. 16).

## II.     Procedural Background

Plaintiffs commenced this action on February 8, 2010.  The complaint as amended contains nine counts.  Count 1 is a claim under § 1983 for violations of the Fourth and Fourteenth Amendments by defendants Siciliano, Bouchard, Mimnaugh, Phillips, and Swaine.  Count 2 is a *Monell* claim under § 1983 against the City of Leominster.  Count III alleges violations of the Massachusetts Civil Rights Act, Mass. Gen. Laws ch. 12, § 11I, by the individual defendants other than Ciccolini.  Counts 4, 5, 6, 7, and 8 allege false imprisonment, assault and battery, intentional infliction of emotional distress, "aiding and abetting," and civil conspiracy, respectively, against the same defendants.  Count 9 alleges that defendant Ciccolini is liable as a supervisor for the acts of the other individual defendants.

Defendants have moved for summary judgment as to all counts of the amended complaint. They have also moved to strike portions of plaintiffs' opposition to that motion.

## III.    Motion to Strike

As a general matter, only evidence that would be admissible at trial may be considered by the court on summary judgment.  *See Garside v. Osco Drug, Inc.*, 895 F.2d 46, 49-51 (1st Cir. 1990).[2]  A motion to strike is the proper vehicle for challenging the admissibility of evidence offered at summary judgment.  *See Casas Office Machs., Inc. v. Mita Copystar Am., Inc.*, 42 F.3d 668, 682 (1st Cir. 1994).

---

[2] However, under Fed. R. Civ. P. 56(c)(4), affidavits—although not themselves admissible at trial—may be offered in support of, or opposition to, summary judgment if they set forth facts that would be admissible under the Federal Rules of Evidence. *Garside*, 895 F.2d at 49-51.

Defendants do not, however, contest the admissibility of any of plaintiffs' evidentiary submissions. Instead, they seek to strike two portions of plaintiffs' memoranda in opposition to summary judgment. Defendants object to (1) certain statements in the factual background section of plaintiffs' opposition brief and (2) portions of plaintiffs' response to defendants' statement of facts that was filed with their motion for summary judgment. *See* L.R. 56.1.

## A.      Opposition Memorandum

Defendants contend that portions of plaintiffs' opposition memorandum should be struck because (1) plaintiffs do not cite specific evidentiary support for the factual assertions contained in those sections and (2) the evidence does not support the specific assertions. In considering summary judgment, the Court must consider those portions of the evidentiary record that are cited in the parties' briefs and may consider additional, not-cited portions of the record. Fed. R. Civ. P. 56(c)(3) ("The court *need consider* only the cited materials, but it *may consider* other materials in the record." (emphasis added)). Conclusory factual statements made in briefs without reference to evidence need not be considered at all, or may be treated as mere argument. Here, the Court will simply disregard any factual assertions that do not have appropriate citations to the record and specific evidentiary support. Under the circumstances, defendants' motion to strike portions of plaintiffs' briefs is unnecessary and will be denied.

## B.      Response to Statement of Facts

Defendants seek to strike paragraphs 11, 56-58, 62, 88, 94-95, 98-100, and 107 of plaintiffs' response to defendants' statement of material facts. Paragraphs 11, 56-58, 62, and 88 are denials of certain assertions in defendants' statement of facts; paragraphs 94-95, 98-100, and 107 are supplemental facts that plaintiffs assert are relevant to the summary judgment motion.

Like the parties' briefs, statements of material facts are intended to assist the court in deciding a motion for summary judgment by indicating portions of the record that are relevant to its decision.  *See Calvi v. Knox County*, 470 F.3d 422, 427 (1st Cir. 2006) (holding that local rules requiring a statement of material facts "are useful devices for focusing a district court's attention on what is—and what is not—genuinely controverted").  But unless the statement is admitted, the court is required to evaluate the facts by reference to the record.[3]

As to paragraph 11, plaintiffs deny that detective Siciliano received a confidential tip specifically identifying Inman II as the person sighted near the Motel 6 on the evening of July 7. That denial has adequate evidentiary support.  In his deposition, detective Siciliano stated that he received a tip from an informant who said that "Michael Inman was down there in room 60 earlier."  (Ex. 14, Siciliano Dep. at 40).  In a later affidavit, Siciliano averred that the informant specifically identified Inman II.  (Ex. 5, ¶ 11).  However, the inconsistency between those two statements casts sufficient doubt on the specific content of the tip to warrant plaintiffs' denial.

As to paragraph 56, plaintiffs deny that Inman suffered no injury as a result of the action of three of the officers who entered the motel room.  Plaintiffs cite their interrogatory responses and contend that the conduct of all five officers caused emotional and psychological harm resulting from fear and humiliation.  (Ex. 15).  These statements are sufficient to support plaintiffs' denials.

---

[3] A factual assertion contained in a movant's statement of facts will be deemed admitted only if the opposing party does not dispute that assertion.  *See* L.R. 56.1.  If the assertion is disputed, the court is required to evaluate the evidence directly.  For this reason, disputing plaintiffs' assertions would have the same effect as a motion to strike—without engaging the court in a line-by-line editorial exercise with respect to plaintiffs' filings.

Defendants further contend that portions of plaintiffs' denials in paragraph 56, as well as those in paragraphs 57-58, 62, 68, and 88, must be struck because they contain "legal argument that attempts to evade plaintiffs' burden of proof . . . ."  Legal arguments contained in such statements of facts do not control the evaluation of the evidence on summary judgment. However, in each paragraph, plaintiffs cite sufficient evidence as to their factual assertions to preclude the Court from deeming defendants' assertions to be admitted.  The motion to strike will therefore be denied as to those paragraphs.

As to paragraphs 94-95, 98-100, and 107, defendants contend that plaintiffs' supplemental statement of facts is not supported by the evidence on which it relies.  Some of the statements do contain rhetoric that goes beyond what the evidence can support.  For example, in paragraph 100, plaintiffs assert that defendant Ciccolini "was completely indifferent as to whether it was Michael Inman or Michael Inman II who was present at the Motel 6."  (56.1 Resp. ¶ 100).  That conclusion goes to questions of state of mind that may be among the ultimate issues to be resolved at trial and cannot be conclusively supported based on the evidentiary record at this stage.  However, it is sufficient that defendants dispute those assertions; it is not necessary to strike them.  In deciding defendants' motion for summary judgment, the Court will rely only on undisputed facts and the evidentiary record, construed in the light most favorable to plaintiffs.

Accordingly, defendants' motion to strike will be denied.

## IV.     Summary Judgment

### A.     Standard of Review

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

"Essentially, Rule 56[] mandates the entry of summary judgment 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'"  *Coll v. PB Diagnostic Sys.*, 50 F.3d 1115, 1121 (1st Cir. 1995) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).  In making that determination, the Court views "the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor."  *Noonan v. Staples, Inc.*, 556 F.3d 20, 25 (1st Cir. 2009).  When "a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'"  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)).  The non-moving party may not simply "rest upon mere allegation or denials of his pleading," but instead must "present affirmative evidence."  *Id.* at 256-57.

**B.      § 1983 Claims (Count 1)**

Section 1983 is a vehicle for vindicating substantive rights conferred by the Constitution or laws of the United States that have been violated by persons acting under color of state law. *See Graham v. Connor*, 490 U.S. 386, 393-94 (1989); *Albright v. Oliver*, 510 U.S. 266, 315 (1994).  Here, it is not disputed that defendants Siciliano, Bouchard, Mimnaugh, Phillips, and Swaine are state actors being sued for actions taken pursuant to their official duties; the issue is solely whether their actions on the night of July 7 deprived plaintiffs of their constitutional rights.

The Fourth Amendment guarantees the right "to be secure . . . against unreasonable searches and seizures."  Plaintiffs allege that the officers violated this right by (1) unlawfully entering their motel room, (2) unlawfully seizing or arresting them, and (3) using excessive force in detaining them in the course of that seizure.  Defendants both deny that the officers' conduct

rose to the level of a constitutional deprivation and contend that to the extent that they did violate the Fourth Amendment, they are entitled to qualified immunity.

The doctrine of qualified immunity protects public employees "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The First Circuit has abandoned its former three-part qualified-immunity analysis and adopted the two-part test articulated by the Supreme Court in *Pearson v. Callahan*, 555 U.S. 223 (2009). *See Maldonado v. Fontanes*, 568 F.3d 263, 269 (1st Cir. 2009). Under *Pearson* and *Maldonado*, the relevant inquiries are (1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right, and (2) whether the right at issue was clearly established at the time of the defendant's alleged misconduct. *Id.*[4] For purposes of the second step of that analysis, whether the right in question was "clearly established" depends on "(a) whether the legal contours of the right in question were sufficiently clear that a reasonable officer would have understood that what he was doing violated the right, and (b) whether in the particular factual context of the case, a reasonable officer would have understood that his conduct violated the right." *Mlodzinski v. Lewis*, 648 F.3d 24, 33 (1st Cir. 2011).

### 1.   Unlawful Entry

A guest in a hotel or motel is entitled under the Fourth Amendment to essentially the same protections as he or she would have at home. *United States v. Jones*, 523 F.3d 31, 36 (1st Cir. 2008) (citing *Stoner v. California*, 376 U.S. 483, 490 (1964)). It is well-established that a

---

[4] Although conducting this two-step analysis in sequence is sometimes advisable because doing so "promote[s] the development of constitutional precedent," courts have discretion to avoid the direct constitutional question when a matter may be resolved at the second step. *Maldonado*, 568 F.3d at 270.

warrantless entry into a residence is presumptively unconstitutional unless an exception applies. *Groh v. Ramirez*, 540 U.S. 551, 558-59 (2004); *United States v. Romain*, 393 F.3d 63, 68 (1st Cir. 2004).  Here, it is undisputed that the officers did not have a warrant for either the arrest of Inman II or the search of the Motel 6 room where plaintiffs were sleeping.  However, the officers rely on the "exigent circumstances" exception to the warrant requirement.[5]

The "exigent circumstances" exception encompasses "situations in which some compelling reason for immediate action excuses law enforcement officers from pausing to obtain a warrant." *United States v. Martins*, 413 F.3d 139, 146 (1st Cir. 2005).  Whether an exigency existed at the time of a warrantless entry is assessed "in light of the totality of the circumstances."  *United States v. Wihbey*, 75 F.3d 761 (1st Cir. 1996).  The inquiry is "limited to the objective facts reasonably known to, or discoverable by, the officers at the time of the search."  *United States v. Tibolt*, 72 F.3d 965, 969 (1st Cir. 1995).

Here, defendants base their claim of exigent circumstances on the presence of the weapon in the room.  In general, a situation that may be reasonably thought to present a threat to the police or the public is sufficient to establish exigent circumstances.  *Martins*, 413 F.3d at 146 (citing *Hegarty v. Somerset Cnty.*, 53 F.3d 1367, 1374 (1st Cir. 1995)).  Immediately before the events at issue, the officers had received information that led them to believe that Inman II was armed, dangerous, and located at the Motel 6.  Upon seeing the weapon, a reasonable officer would have perceived an immediate threat to his safety, even if he were mistaken as to the gun's proper owner and as to the presence of Inman II in the room.  *See, e.g.*, *Dean v. Worcester*, 924

---

[5] The testimony of officer Siciliano suggests that the entry may also have been justified under the "consent" exception.  (Ex. 14, Siciliano Dep. at 6, 25-27).  However, the parties appear to agree that there is a factual dispute as to whether plaintiffs consented to the entry of the police into the motel room.

F.2d 364, 368 (1st Cir. 1991) (holding that an officer's mistake as to identity does not invalidate an otherwise reasonable warrantless entry).  Those circumstances would justify their entry without a warrant.[6]

The difficulty with that position, however, is that the evidence does not establish that the firearm was plainly visible *before* the officers entered the room.  Inman testified that his gun was in plain sight, but from his perspective inside the room.  (Inman Dep. at 60-61).  Neither his testimony nor any other evidence establishes that the gun was visible from the doorway.  When asked whether any officers verbally acknowledged the weapon before they entered the room, Inman responded that they did not.  (*Id.* at 61).  The testimony of detective Siciliano likewise suggests that the officers entered before the weapon was within view.  (Siciliano Dep. at 25).  On this record, it is not clear that the gun was sufficiently visible or otherwise known to the officers. It is therefore unclear whether the presence of the gun could support a reasonable belief that there was a "compelling necessity for immediate action as [would] not brook the delay of obtaining a warrant."  *DeMayo v. Nugent*, 517 F.3d 11, 15 (1st Cir. 2008).  If the officers entered the motel room before the purported exigent circumstances existed, that action could constitute an unlawful entry in violation of the Fourth Amendment.

Moreover, the right to be free from such misconduct was clearly established at the time of the events at issue in this case.  It is a long-standing tenet of Fourth Amendment law that "the question whether a warrantless search of a home is reasonable and hence constitutional must be answered no" unless an exception such as exigent circumstances applies.  *Kyllo v. United States*,

---

[6] Those circumstances would also justify execution of a protective sweep of the room. *See Maryland v. Buie*, 494 U.S. 325 (1990) (permitting a protective sweep to be conducted if an officer possesses a reasonable belief that the area to be swept harbors a dangerous individual).

533 U.S. 27, 31 (2001).  Making all inferences in plaintiffs' favor, a reasonable fact-finder could

conclude that a competent officer under the circumstances of this case would have understood

both that exigent circumstances did not exist before the officers entered the room and that

entering the room in the absence of such circumstances violated plaintiffs' constitutional rights.

Because defendants' conduct may be found to have been a clear violation of plaintiffs'

right against unlawful entry, summary judgment will be denied as to that claim.

### 2.        Unreasonable Seizure/Illegal Arrest

An officer may detain a person for a brief investigatory stop if he has a "reasonable,

articulable suspicion that criminal activity is afoot" and if the manner of the stop is "reasonable

under all the circumstances."  *United States v. Romain*, 393 F.3d 63, 70-71 (1st Cir. 2004); *see*

*Terry v. Ohio*, 392 U.S. 1, 16 (1968).[7]  In evaluating the reasonableness of such a seizure, a court

must balance "the nature and quality of the intrusion on personal security against the importance

of the governmental interests alleged to justify the intrusion."  *United States v. Chhien*, 266 F.3d

1, 6 (1st Cir. 2001).  Whether conduct is reasonable may evolve over the course of a changing

situation "depend[ing] on what the officer knows (or has reason to believe) and how events

unfold."  *Romain*, 393 F.3d at 71 (internal citations omitted).[8]  By contrast, a detention that

---

[7] The mere questioning of a citizen by the police is not a "seizure" for these purposes.  "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred."  *Terry*, 392 U.S. at 19 n.16.

[8] Defendants argue that detention of plaintiffs was reasonable under *Michigan v. Summers*, 452 U.S. 692 (1981) and *Muehler v. Mena*, 544 U.S. 93, 99 (2005).  Under those cases, officers conducting a valid search of a residence may detain individuals during the course of that search for purposes of officer and public safety.  Because the reasonableness of the officers' entry and search of the hotel room is a disputed issue, summary judgment is inappropriate as to that basis for the seizure.

exceeds the scope of a reasonable investigatory stop is a *de facto* arrest for which the officer must

have probable cause. *See United States v. Zapata*, 18 F.3d 971, 975 (1st Cir. 1994).

Here, defendants concede that the officers "seized" plaintiffs within the meaning of the

Fourth Amendment after entering the motel room. The first issue is therefore whether the

officers' conduct was appropriate and based on reasonable suspicion.

Defendants assert that the officers' actions upon entering the motel room were reasonable

in light of the dangerous situation they believed they were entering. Defendants may be correct in

that respect. Both an informant's tip and the hotel registry indicated that Inman II might be

present in the motel room. (Ex. 5, 8). Once the officers entered the room, a firearm was in plain

sight on the bedside table. (Inman Dep. at 60-61). Under these circumstances, the officers may

have had a reasonable suspicion that they had entered into a dangerous situation that required

restraining plaintiffs for purposes of safety. *See United States v. Acosta-Colon*, 157 F.3d 9, 18

(1st Cir. 1998) ("Police officers engaged in an otherwise lawful stop must be permitted to take

measures—including the use of handcuffs—they believe reasonably necessary to protect

themselves from harm, or to safeguard the security of others."). On these grounds, defendants'

initial conduct upon entering the room may have constituted a valid investigatory detention.

However, there is evidence suggesting that the initial justification for this seizure was

fleeting. Inman testified that he explained to the officers that the firearm in the room was his own

and that as a federal air marshal he was authorized to carry it. (Ex. 10, Consalvo Dep. at 58).

His credentials were in the room, next to the firearm. (*Id.*). A protective sweep was conducted

immediately and was completed within "a minute or so . . . . [m]aybe a couple of minutes." (Ex.

14, Siciliano Dep. at 18). Inman II was not in the room. Nonetheless, plaintiffs testified that the

17

officers detained them in handcuffs for approximately 30 minutes; during some substantial part of that time, Inman was naked.  (Ex. 1, Inman Dep. at 62, 66-67; Ex. 10, Consalvo Dep. at 67). That prolonged (and humiliating) detention may have continued long after the initial circumstances that made it reasonable had subsided, and thus its continuation may have been unreasonable.

The second issue is whether the officers' conduct may have escalated from an investigatory detention to a *de facto* arrest that would require probable cause.

There is no "scientifically precise formula" for distinguishing between an investigatory stop and a *de facto* arrest.  *Zapata*, 18 F.3d at 975.  The standard is "whether there was 'a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest."  *United States v. Trueber*, 238 F.3d 79, 93 (1st Cir. 2001).  This objective but open-ended inquiry focuses on "how a reasonable [person] in the suspect's shoes would have understood his situation."  *Id.* at 93-94 (listing as factors to be considered the encounter's setting, the number of officers in close proximity to the detainee, the brandishing of weapons, and the length of the encounter).  The use of physical restraints is especially likely to constitute a *de facto* arrest.  *Acosta–Colon*, 157 F.3d at 18 ("[T]he use of handcuffs, being one of the most recognizable indicia of traditional arrest, substantially aggravates the intrusiveness of a putative [investigatory] stop.").[9]

---

[9] The use of physical force—even the brandishing of guns—does not necessarily transform an investigatory stop into a *de facto* arrest.  *See United States v. Maguire*, 359 F.3d 71, 78 (1st Cir. 2004) ("[T]he use or display of a weapon does not alone turn an investigatory stop into a *de facto* arrest."); *United States v. Hensley*, 469 U.S. 221, 235 (holding that the mere use of force does not convert an investigative stop into an arrest); *United States v. Taylor*, 162 F.3d 12, 21 (1st Cir. 1998) (holding that officer's action of putting suspects on the ground and searching for weapons did not effect a *de facto* arrest).  However, such behavior obviously tends to suggest a formal arrest.

Here, a reasonable fact finder might determine that the officers subjected plaintiffs to a *de facto* arrest. Their treatment of plaintiffs after entering the motel room obviously had indicia of a traditional arrest—in particular, physical restraint and the use of drawn weapons. Certainly a reasonable person in the position of plaintiffs might have understood himself or herself to be under arrest. But an arrest may be lawfully made only on probable cause to believe that plaintiffs were committing a crime, and no such probable cause existed here.

Moreover, plaintiffs' unreasonable-seizure claims are based on the clearly established principle that the police may not detain a citizen unless justified by a reasonable suspicion of criminal conduct, s*ee Chhien*, 266 F.3d at 6, and may not arrest a person without probable cause, *Zapata*, 18 F.3d at 975. Granted, qualified immunity will protect officers from liability for the forcible detention of a person if it was "fairly debatable among reasonable officers whether detaining plaintiffs in handcuffs" for as long as they did was reasonable under the circumstances. *Mlodzinski*, 648 F.3d at 36. Here, however, the officers detained plaintiffs for substantially longer than was necessary to ascertain that Inman II was not present at the Motel 6 or to ensure their own safety. Making all inferences in plaintiffs' favor, a reasonable fact-finder could conclude that a competent officer in the circumstances of the July 7 investigation would have understood that the officers were not justified in continuing to detain plaintiffs as they are alleged to have done and for as long as they did. If proved, such conduct would be a clear violation of plaintiffs' constitutional rights for purposes of qualified immunity.

In sum, because the evidence may support a claim based on an unlawful seizure or arrest under law that was clearly established at the time of the alleged events, summary judgment will be denied as to those claims.

### 3.      **Excessive Force**

In order to establish a Fourth Amendment claim based on alleged excessive use of force, the plaintiff must show (1) that there was a "seizure" within the meaning of the Fourth Amendment; and that (2) the use of force during the seizure was unreasonable under all the circumstances. *Graham*, 490 U.S. at 394; *Bastien v. Goddard*, 279 F.3d 10, 14 (1st Cir. 2002). Here, because defendants concede that there was a "seizure," plaintiffs must show only that the degree of force used during that seizure was unreasonable. *Graham*, 490 U.S. at 395.

Of course, excessive force is by definition unreasonable force in clear violation of the Fourth Amendment. *Mlodzinski*, 648 F.3d at 33-34. However, the right to make an arrest carries with it the right to use some degree of force. *See Graham*, 490 U.S. at 396. Only excessive force is actionable. *Gaudreault v. Municipality of Salem*, 923 F.2d 203, 205 (1st Cir. 1990) ("[N]ot every push or shove rises to the level of a constitutional violation."). Claims of excessive force are judged by an objective reasonableness standard. *Graham*, 490 U.S. at 397.[10] "An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional." *Id.* at 397. Moreover, because "reasonable people sometimes make mistaken judgments[] and a reasonable officer sometimes may use unreasonable force . . . [,] 'qualified immunity gives an officer the benefit of a margin of error.'" *Id.* (quoting *Morelli v. Webster*, 552 F.3d 12, 24 (1st Cir. 2009)).

---

[10] A non-exclusive list of criteria that are relevant to determining how much force is reasonable under this standard includes "the severity of the crime at issue," the extent (if any) to which "the suspect poses an immediate threat to the safety of the officers or others;" and whether the suspect "is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396.

Plaintiffs contend that their detention was conducted with excessive force because it was prolonged and humiliating and because it involved their restraint by handcuffs and the display of drawn weapons.  However, legal principles established at the time of the alleged events suggest that the level of force used may be constitutionally permissible.  Generally, detention in handcuffs for a moderate amount of time alone does not constitute excessive force.  *See Muehler v. Mena*, 544 U.S. 93, 100 (2005) (holding that although "duration of a detention can, of course, affect the balance of interests" in determining the reasonableness of force used, a two- to three-hour period in handcuffs was insufficient to support an excessive force claim); *Mlodzinski*, 648 F.3d at 36-37 (holding that although a reasonable officer might belief that a 45-minute detention in handcuffs was excessive under the circumstances, qualified immunity precluded liability on that basis because "officers of reasonable competence could disagree" (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986))).[11]  Moreover, courts have acknowledged that the realities of law enforcement often entail some force and strong language that, while offensive by ordinary standards, does not rise to the level of a constitutional deprivation.  *See, e.g., Flowers v. Fiore*, 359 F.3d 24, 34 (1st Cir. 2004) (finding no constitutional violation in the use of drawn weapons and handcuffs during investigatory stop and search).  These cases—and the absence of cases finding constitutional violations under similar facts—would suggest to an officer acting in a situation such as that

---

[11] The entire encounter on the night of July 7 lasted about 35 minutes; thus, plaintiffs could not have been in handcuffs any longer than that.  Although plaintiffs testified that the handcuffs caused them discomfort, they do not allege substantial injury or extreme pain.  *See Saucier v. Katz*, 533 U.S. 194, 205-06 (2001) (holding that qualified immunity operates in excessive force cases to "protect officers from the sometimes hazy border between excessive and acceptable force" (internal quotation marks omitted)).  *Cf. Mlodzinski*, 648 F.3d at 38 (holding that qualified immunity did not apply where an officer had "point[ed] an assault rifle at the head of an innocent, non-threatening, and handcuffed fifteen-year-old girl for seven to ten minutes, far beyond the time it took to secure the premises and arrest and remove the only suspect").

alleged here that detaining plaintiffs in handcuffs for a substantial period was not a constitutionally impermissible application of force.

In sum, under the circumstances of this case, qualified immunity is warranted as to plaintiffs' excessive force claim because the officers' conduct was not "outside the universe of protected mistakes." *Morelli*, 552 F.3d at 24.[12]

### C.   <u>Municipal Liability for § 1983 Claims (Count 2)</u>

To establish municipal liability, a plaintiff must show that "the municipality *itself* causes the constitutional violation at issue. *Respondeat superior* or vicarious liability will not attach under § 1983." *City of Canton v. Harris*, 489 U.S. 378, 387 (1989); *Monell v. Deptartment of Soc. Servs.*, 436 U.S. 658, 694-95 (1978). Thus, the plaintiff is required to demonstrate both the existence of a policy or custom and a "direct causal link" between that policy and the alleged constitutional deprivation. *Harris*, 489 U.S. at 385; *see also Monell*, 436 U.S. at 694 (policy must be the "moving force [behind] the constitutional violation"); *Santiago v. Fenton*, 891 F.2d at 373, 381-82. "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick v. Thompson*, 131 S.Ct. 1350, 1359 (2011).

Plaintiffs' claim for municipal liability rests on the city's alleged failure to train, supervise, and discipline its police officers. A claim against a municipality under § 1983 is "most tenuous

---

[12]As noted, a court has discretion to avoid the first step of the two-pronged qualified immunity analysis where the second prong controls its decision. *See Maldonado*, 568 F.3d at 269-70 ("Courts have discretion to decide whether, on the facts of a particular case, it is worthwhile to address first whether the facts alleged make out a violation of a constitutional right."). Here, because plaintiffs' excessive-force claim may be resolved at the second step, the Court declines to engage in a factual inquiry at the first step to determine whether the officers used a reasonable degree of force. *See id.* ("Where the answer to the first prong of the immunity question may depend on the further development of the facts, it may be wise to avoid the first step.").

where [it] turns on a failure to train." *Id.* at 1359.  To give rise to liability in such an action, "a

municipality's failure to train its employees in a relevant respect must amount to "deliberate

indifference to the rights of persons with whom the [untrained employees] come into contact.'"

*Id.* (quoting *Canton*, 489 U.S., at 388).  *See also Young v. City of Providence*, 404 F.3d 4, 26-27

(1st Cir. 2005) (holding that, under *Monell*, "any proper allegation of failure to train . . . must

allege that [the officer's] lack of training caused him to take actions that were objectively

unreasonable and constituted excessive force" and that "the identified deficiency in [the training

program was] closely related to the ultimate injury.").

     Plaintiffs' argument rests on testimony that the officers' actions were consistent with their

training and the customs and policies of the LPD.  (Ex. 14, Siciliano Dep. at 29).  However, the

mere fact that officer misconduct is "consistent" with a particular policy is insufficient to support

a *Monell* claim.  *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986) ("[M]unicipal

liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of

action is made . . . by the official or officials responsible for establishing final policy.").  Plaintiffs

do not offer evidence that is adequate to support such a claim.

     Accordingly, summary judgment will be granted to defendants as to count 2.

**D**.    **Supervisory Liability for § 1983 Claims (Count 9)**[13]

     Like municipal liability, supervisory liability under § 1983 cannot be predicated on a

*respondeat superior* theory.  *Barreto-Rivera v. Medina-Vargas*, 168 F.3d 42, 48 (1st Cir. 1999).

---

[13] Count 9 of the complaint does not specify whether it asserts supervisory liability under § 1983 claims or state law.  However, plaintiffs have briefed the issue as if it were a claim under § 1983, and the Court will treat it as such.  In any event, any claim under state law would be barred by Mass. Gen. Laws ch. 258, § 2.  *See Petricca v. City of Gardner*, 194 F. Supp. 2d 1, 4 (D. Mass. 2002).

*See also Monell*, 436 U.S. at 691 (1978).  Rather, any liability incurred by a supervisor must be "on the basis of his own acts or omissions."  *Maldonado-Denis v. Castillo-Rodriguez*, 23 F.3d 576, 581 (1st Cir. 1994).  Thus, supervisory liability for alleged constitutional deprivations attaches if the supervisor is a "primary violator or direct participant in the rights-violating incident" or "if a responsible official supervises, trains, or hires a subordinate with deliberate indifference toward the possibility that deficient performance of the task eventually may contribute to a civil rights deprivation."  *Sanchez v. Pereira-Castillo*, 590 F.3d 31, 49 (1st Cir. 2009) (quoting *Camilo-Robles v. Zapata*, 175 F.3d 41, 44 (1st Cir. 1999)).

The evidence does not establish a claim against Ciccolini for his direct involvement in the events of July 7.  That involvement was limited to sending officers to the Motel 6 after Siciliano requested assistance there.  Although a supervising officer may be liable for the "foreseeable consequences" of actions taken in his capacity as a policy-maker, *Maldonado-Denis*, 23 F.3d at 582, the officers' alleged misconduct that night would not be foreseeable on that basis alone.

Nor does the evidence indicate that Ciccolini exhibited any negligence or willful blindness with respect to the officers' response at the Motel 6 that could amount to "deliberate indifference" to plaintiffs' constitutional rights.  Even if it did, the causal connection between Ciccolini's actions and the possible misconduct that followed is too tenuous to support a claim for supervisory liability.  *See Maldonado-Denis*, 23 F.3d at 582 ("To succeed on a supervisory liability claim, a plaintiff not only must show deliberate indifference or its equivalent, but also must affirmatively connect the supervisor's conduct to the subordinate's violative act or omission.").

Insofar as Ciccolini was responsible for employee training, the analysis is very similar to that which is required in the municipal liability context.[14]  For the reasons discussed as to count 2, the Court finds that the evidence fails to establish a claim against Ciccolini for failure to train.

Accordingly, summary judgment will be granted as to count 9.

### E.        Claim under Mass. Gen. Laws ch. 12, § 11I (Count 3)

The Massachusetts Civil Rights Act provides a right of action to any person whose exercise or enjoyment of rights secured by the federal or state constitution or laws has been interfered with by "threats, intimidation or coercion."  Mass. Gen. Laws ch. 12, § 11I.[15]  The statute thus contemplates a two-part sequence:  liability may be found where (1) the defendant threatens, intimidates, or coerces the plaintiff in order to (2) cause the plaintiff to give up something that he has the constitutional right to do.  *Goddard v. Kelley*, 629 F. Supp. 2d 115, 128 (D. Mass. 2009).  The MCRA affords qualified immunity to public officials to the same extent that § 1983 does.  *Rodriques v. Furtado*, 410 Mass. 878, 881, 885 (1991).

The direct violation of a constitutional right does not establish a MCRA violation because "it is not an attempt to force someone to do something the person is not lawfully required to do." *Columbus v. Biggio*, 76 F. Supp. 2d 43, 54 (D. Mass. 1999) (quoting *Swanset Dev. Corp. v. City*

---

[14] *See, e.g.*, *Jones v. Wellham*, 104 F.3d 620, 628 (4th Cir. 1997) ("While a municipal liability claim based upon a particular official's attributed conduct and a supervisory liability claim against that official based upon the same conduct are not perfectly congruent, each requires proof both of the official's deliberate indifference and of a close affirmative link between his conduct and a resulting constitutional violation by a subordinate.") (citation omitted); *Haynesworth v. Miller*, 820 F.2d 1245, 1262 n.133 (6th Cir. 1987) ("[S]ome courts have equated municipal and supervisory liability.").  Indeed, the First Circuit has sometimes bundled the analyses together.  *See, e.g.*, *Bordanaro v. McLeod*, 871 F.2d 1151, 1154-55 (1st Cir. 1989).

[15] Under the statute, a threat "involves the intentional exertion of pressure to make another fearful or apprehensive of injury or harm"; intimidation "involves putting in fear for the purposes of compelling or deterring conduct"; and coercion means "the application to another of such force, either physical or moral, as to constrain him to do against his will something he would not otherwise have done."  *Planned Parenthood League of Mass., Inc. v. Blake*, 417 Mass. 467, 474 (1994).

*of Taunton*, 423 Mass. 390, 395-96 (1996)).  *See also Longval v. Commissioner of Correction et al.*, 404 Mass. 325, 333 (1989) ("[A] direct violation of a person's rights does not by itself involve threats, intimidation, or coercion and thus does not implicate the [Massachusetts Civil Rights] Act."); *Sarvis v. Boston Safe Deposit and Trust Co.*, 47 Mass. App. Ct. 86, 93 (1999) (stating that *Longval* "affirmed the requirement under the [MCRA] that proof of 'threats, intimidation, or coercion' be in addition to the interference with the exercise or enjoyment of secured rights").[16]

Plaintiffs here were seized, possibly following an unlawful police entry and in violation of their rights right to be free from excessive force and unreasonable seizures.  The officers' conduct in seizing plaintiffs of course could constitute a form of coercion.  However, plaintiffs do not allege that the officers subjected them to that coercion in order to cause them to give up some other right (for example, the right to vote).  Rather, the seizure itself is the alleged constitutional violation.  That violation cannot satisfy both the "coercion" and "violation" elements of an MCRA claim.  *See Gallagher v. Commonwealth of Mass.*, 2002 WL 924243, at *1 (D. Mass. Mar. 11, 2002) (holding that no violation of the MCRA exists where excessive force against a prisoner was

---

[16] In *Longval*, a prisoner who was shackled and handcuffed as part of a transfer to a segregation unit brought a claim under the MCRA, claiming a violation of his due process right to a hearing prior to the transfer. Although the Supreme Judicial Court held that resolution of the issue on summary judgment was premature, it noted the following:

> . . . we see no coercion, within the meaning of the State Civil Rights Act, simply from the use of force by prison officials, authorized to use force, in order to compel a prisoner to do something he would not willingly do, even if it turns out that the official had no lawful right to compel the prisoner to take that action.  Shackling and handcuffing [the plaintiff] and taking him to Concord was not by itself coercive under the Civil Rights Act, as [the plaintiff] claims.  If the officials had some further purpose in treating [the plaintiff] as they did, threats, intimidation, or coercion might be involved.  Conduct, even unlawful conduct, however, lacks these qualities when all it does is take someone's rights away directly.

*Id.* (internal citations omitted).

not used in furtherance of violating some additional right). *Cf. Davis v. Rennie*, 264 F.3d 86, 112 (1st Cir. 2001) (holding that one officer's physical restraint of the plaintiff and another's use of unreasonable force satisfied the "coercion" and "interference with the enjoyment of rights" elements, respectively).  Because plaintiffs do not offer evidence that the officer's use of force was intended to coerce plaintiffs into foregoing some other right,

summary judgement will be granted for defendants as to count 3.

### F.     False Imprisonment (Count 4)

In Massachusetts, false imprisonment is defined as the "intentional and unlawful confinement of a person, either directly or indirectly, of which the person confined is conscious or is harmed by such confinement."  *Jonielunas v. City of Worcester Police Dep't*, 338 F. Supp. 2d 173, 177 (D. Mass. 2004).  A police officer is liable for false imprisonment if, without probable cause, he arrests, or causes the arrest of, the plaintiff.  *See id.* at 177.  This is essentially the same as the Fourth Amendment standard for unlawful arrest.

Because summary judgment will be denied as to the § 1983 claims based on unlawful arrest, it will also be denied as to count 4.

### G.     Assault and Battery (Count 5)

In Massachusetts, a police officer who intentionally causes harmful or offensive contact or attempts to do so during the course of an arrest is liable for the common law torts of assault and battery, respectively, if he uses excessive force in effecting that arrest.  *Raiche v. Pietroski*, 623 F.3d 30, 40 (1st Cir. 2010).  However, the liability of police officers for assault or battery is limited insofar as law enforcement "may use such force as is reasonably necessary to effect [an] arrest."  *Dean*, 924 F.2d at 369 (citing *Julian v. Randazzo*, 380 Mass. 391, 396 (1980)).  Where,

as here, a plaintiff brings both a § 1983 excessive force claim and state-law claims for assault and battery, the reasonableness of the force used with respect to the § 1983 claim controls the assault and battery analysis. *Raiche*, 623 F.3d at 40.

Thus, because disputes of fact exist as to the reasonableness of the force used by the officers, summary judgment will also be denied as to the assault and battery claims.

**H.**    **Intentional Infliction of Emotional Distress (Count 6)**

To establish a claim for intentional infliction of emotional distress ("IIED") under Massachusetts law, a plaintiff must prove that (1) the defendant either intended to inflict emotional distress or knew or should have known that emotional distress was the likely result of his conduct; (2) the conduct was extreme and outrageous; (3) the conduct caused the plaintiff emotional distress; and (4) the emotional distress was severe and of a nature that no reasonable person could be expected to endure it. *Agis v. Howard Johnson Co.*, 371 Mass. 140, 144-45 (1976).

Conduct is "extreme and outrageous" if it is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Foley v. Polaroid Corp.*, 400 Mass. 82, 99 (1987). This standard may require more than is necessary to state a claim under § 1983. *See, e.g.*, *Guckenberger v. Boston Univ.*, 957 F. Supp. 306, 319 (D. Mass. 1997) ("[T]he mere fact that the defendants' conduct may turn out to be violative of the plaintiff['s] civil rights does not . . . necessitate a finding that the conduct is sufficiently egregious to state a claim for intentional infliction of emotional distress.").

Although the actions alleged in this case may have been unreasonable for purposes of Fourth Amendment analysis, they did not constitute the sort of targeted, malicious conduct that is required to meet the high bar for an IIED claim. *See Doyle v. Hasbro, Inc.*, 103 F.3d 186, 195 (1st Cir. 1996). The evidence shows that the officers may have acted unreasonably in entering the motel room, physically detaining plaintiffs, and interrogating them about the whereabouts of Inman II. However, the facts that plaintiffs allege essential depict an series of mistakes accompanied by excessive zeal on the part of law enforcement. Those errors do not evince the kind of contemptible malice that is necessary to support an IIED claim.

Accordingly, summary judgment will be granted for defendants as to count 6.

I.      **Aiding and Abetting (Count 7)**

Massachusetts courts have recognized a theory of joint liability for the tortious conduct of another where the defendant "knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other." Restatement (Second) of Torts § 876(b) (1979). *See also Nelson v. Nason*, 343 Mass. 220, 222 (1961) (allowing recovery where defendant participated in high-speed automobile race on a public way in which the other vehicle lost control); *Taylor v. American Chem. Council*, 576 F.3d 16, 35 n.20 (1st Cir. 2009) (discussing the application of § 876(b) by Massachusetts courts).[17]

Plaintiffs contend that the officers aided and abetted one another in committing the alleged civil rights violations and tortious acts. The evidence is sufficient to support plaintiffs' claim, at

---

[17] The "substantial assistance" theory of joint liability contained in § 876(b) is generally treated as a subpart of civil conspiracy law. *See, e.g.*, *Taylor*, 576 F.3d at 34. However, the Supreme Judicial Court has held that § 876(b), unlike the civil conspiracy claims plaintiff asserts here in count 8, does not require an agreement. *See Nelson*, 343 Mass. at 222 ("Direct testimony of an agreement . . . was not required."). Because plaintiff alleges aiding and abetting (count 7) separately from civil conspiracy (count 8), the court will treat the two separately.

this stage, that certain officers assisted others in the alleged misconduct.  Summary judgment as to count 7 will accordingly be denied.

### J.   Civil Conspiracy (Count 8)

Massachusetts recognizes two types of civil conspiracy:  true conspiracy and conspiracy based on vicarious liability.  *See Taylor v*, 576 F.3d at 34-35.  To establish true conspiracy, plaintiffs must show that "defendants, acting in unison, had some power of coercion over [plaintiffs] that they would not have had if acting independently."  *Aetna Cas. Sur. Co. v. P & B Autobody*, 43 F.3d 1546, 1563 (1st Cir. 1994).  The second form of conspiracy requires "first, a common design or an agreement, although not necessarily express, between two or more persons to do a wrongful act and, second, proof of some tortious act in furtherance of the agreement."  *Id.* at 1564.  Both forms are reflected in the principles of liability for concerted action contained in § 876 of the Restatement (Second) of Torts.  *Taylor*, 576 F.3d at 34.

Plaintiffs have advanced no argument under either theory and have pointed to no facts to support the claim.  In any event, the evidence does not support a claim of conspiratorial conduct by the officers.  Certainly, to the extent that the officers jointly caused the alleged torts and constitutional violations, plaintiffs may seek joint liability.  *See, e.g.*, *Farrah v. Gondella*, 725 F. Supp. 2d 238, 249 (D. Mass. 2010) (granting summary judgment for law enforcement defendants for claim based on alleged civil rights violations); *Commonwealth v. Chhim*, 447 Mass. 370, 380 (proof of a joint venture does not require evidence of advance planning).  However, because the evidence does not reveal a basis for a claim of civil conspiracy, summary judgment will be granted for defendants as to count 8.

**IV.**     <u>**Conclusion**</u>

For the foregoing reasons,

1.      Defendants' motion to strike portions of plaintiffs' filings is DENIED;

2.      Defendants' motion for summary judgment is GRANTED as to the excessive force

claim against the officers in Count 1, GRANTED as to the municipal liability claim

against the City of Leominster in Count 2, GRANTED as to the intentional

infliction of emotional distress claim against the officers in Count 6, GRANTED as

to the civil conspiracy claim against the officers in Count 8, GRANTED as to the

supervisory liability claim against Ciccolini in Count 9, and DENIED as to all other

claims.


**So Ordered.**

/s/ F. Dennis Saylor
F. Dennis Saylor IV
United States District Judge

Dated:  May 31, 2012